**UNITED STATES of America; the State of New York, and UDC–Love Canal, Inc., Plaintiffs,**

v.

**HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.**

**No. CIV–79–990C.**

United States District Court,
W.D. New York.

June 6, 1990.

As Modified July 17, 1990.

Hurwitz & Fine, P.C. (Theodore J. Burns, of counsel), Buffalo, N.Y., for defendant County of Niagara.

Piper & Marbury (Thomas H. Truitt, and Steven K. Yablonski, of counsel), Washington, D.C., for defendant Occidental Chemical Corp.

Robert Abrams, Atty. Gen., State of N.Y. (Eugene Martin–Leff, Asst. Atty. Gen., of

.counsel), New York City, for plaintiff State of N.Y.

## ORDER

CURTIN, District Judge.

## BACKGROUND

The Niagara County Health Department ("NCHD") was originally named as a defendant by plaintiff United States of America ("United States"). According to the original complaint, dated December 20, 1979, the NCHD was named as a defendant "only to insure that the remedial measures requested by plaintiff can be fully implemented, if necessary, by the County Health Department's power of entry to suppress or remove." Item 1 at ¶ 12. In the United States' second amended complaint, dated December 8, 1983, the NCHD was not named as a defendant. *See* Item 141.

In its most recent amended cross-claim against defendant Niagara County ("County"), defendant Occidental Chemical Corporation ("OCC") seeks "indemnity or contribution ... pursuant to CERCLA or otherwise, in whole or in part for the amount of any" damages for which OCC is found liable. Item 155 at ¶ 77. Since the filing of OCC's amended cross-claim, this court has found OCC strictly, jointly, and severally liable under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for the costs incurred by the United States and the State of New York ("State") in responding to the conditions at the Love Canal landfill, *see United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546 (W.D.N.Y.1988), and jointly and severally liable under the New York common law of public nuisance for the costs incurred by the State in abating the conditions at the site. *See United States v. Hooker Chemicals & Plastics Corp.*, 722 F.Supp. 960 (W.D.N.Y.1989).

The County has moved under Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure to dismiss OCC's cross-claim for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment declaring that OCC is not entitled to indemnity or contribution from the County as a matter of law. Since the parties have presented, and the court has not excluded, matters outside the pleadings, the County's motion shall be treated as one for summary judgment. FED.R.CIV.P. 12(b).[1]

The facts of this case have been set forth in previous orders issued by the court, *see United States v. Hooker Chemicals & Plastics Corp.*, 722 F.Supp. 960 (W.D.N.Y. 1989); *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546 (W.D.N. Y.1988); *United States v. Hooker Chemicals & Plastics Corp.*, 123 F.R.D. 3 (W.D. N.Y.1988), and shall not be repeated herein. Reference shall be made to those facts and to any additional facts as necessary for resolution of the pending motion.

## DISCUSSION

In order to prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). *See generally Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A material fact is one "that might affect the outcome of the suit under the governing law ... [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact will be considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion," *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and "[u]ncertainty as to the true state of any material fact defeats the motion." *United States v. One Tintoretto*

---

**1.** OCC has not moved for summary judgment against the County.

*Painting,* 691 F.2d 603, 606 (2d Cir.1982) (citation omitted). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The County argues that it cannot be held liable for indemnity or contribution to OCC on two grounds. First, the County argues that it is not a liable or potentially liable party under Section 107(a) of CERCLA, which, according to the County, is a prerequisite for liability as an indemnitor or contributor. Second, the County asserts that, even if the court finds that OCC is entitled to pursue such a cross-claim under state-law principles, it cannot be held liable because no "special relationship" existed between it and OCC as required by New York law. OCC responds that it need not establish that the County is a covered party under CERCLA because its cross-claim arises under New York law, and asserts that the record demonstrates that under state law the County is potentially liable for any response costs assessed against OCC to the extent that the County's conduct gave rise to such costs.

I. *State–Law Contribution Claims Under CERCLA*

■ Section 107(a) of CERCLA establishes four classes of persons liable for response costs, *see* 42 U.S.C. §§ 9601(23)–(25), 9607(a)(4)(A)–(B), related to a release or threatened release of a hazardous substance, *see* 42 U.S.C. § 9601(14); *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1040 n. 6 (2d Cir.1985):

(1) the owner and operator of a vessel or a facility, as those terms are defined by CERCLA, *see* 42 U.S.C. §§ 9601(9), 9601(25);

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treat-

ment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person.

42 U.S.C. § 9607(a) (Supp. V 1987). *See State of New York v. Shore Realty Corp.,* 759 F.2d at 1043 & n. 16 (2d Cir.1985). The Superfund Amendments and Reauthorization Act of 1986 ("SARA") provides:

Any person may seek contribution from any other person *who is liable or potentially liable under section 9607(a) of this title,* during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.... Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1) (emphasis added) (codifying Pub.L. No. 99–499, § 113(b), 100 Stat. 1647 (1986)). The County argues that the express language of this section requires that it must fit within one of the four categories enumerated in Section 107(a) in order to be liable to OCC for contribution. Asserting that at Love Canal it neither owned or operated any property, disposed of or arranged for the disposal of hazardous substances, nor accepted any hazardous substances for transport, the County maintains that OCC's cross-claim must be dismissed because the County is not "liable or potentially liable" within the meaning of Section 107(a).

OCC does not challenge the County's claim that it is not a liable or potentially liable party under Section 107(a). Rather, OCC insists that it is entitled to pursue contribution for CERCLA response costs

from the County under state-law principles, and that, consequently, whether the County falls within the ambit of Section 107(a) is irrelevant. In support of its argument, OCC cites CERCLA Section 107(e)(2). That section provides:

> Nothing in this subchapter ... shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e)(2).[2] Citing *United States v. New Castle County*, 642 F.Supp. 1258 (D.Del.1986); *Colorado v. ASARCO, Inc.*, 608 F.Supp. 1484 (D.Colo.1985); and *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983), the County replies that most federal courts that have considered the issue have held that "the right to contribution must be determined by federal common law, not by the common law of the various states." Item 894 at 6. Consequently, the County argues, it cannot be held liable for contribution to OCC under state-law standards.

Contrary to the County's position, the court sees nothing in the terms of Section 107(e)(2) indicating that Congress intended only to preserve the right of a party liable under CERCLA to pursue federal causes of action, and the County has not cited any legislative history indicating that Congress meant otherwise. Additional support for this conclusion is supplied by Section 302(d), which provides in relevant part:

> Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal *or State* law, *including common law,* with respect to releases of hazardous substances or other pollutants or contaminants.

42 U.S.C. § 9652(d) (1982) (emphasis added).

Furthermore, the cases cited by the County do not hold differently. The courts in *Chem–Dyne* and *ASARCO* did not hold that contribution for CERCLA response costs could not be recovered under state law. Rather, as noted in *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651 (N.D.Ill.), *aff'd*, 861 F.2d 155 (7th Cir.1988):

> the courts [in *Chem–Dyne* and *ASARCO* ] held that federal common law rather than state law determines the availability of an action for contribution *against parties that are liable under CERCLA....* The courts did not state or suggest that CERCLA preempts any state law remedies to recover the costs of site cleanup from parties who are not liable under CERCLA but are potentially liable under state law.

685 F.Supp. at 657–58 (emphasis supplied) (holding that party liable under CERCLA could seek contribution for response costs under Arkansas law regardless of whether party from whom contribution was sought was liable for contribution under CERCLA). And in *New Castle County*, the court did not address the viability of state-law contribution claims for CERCLA response costs. Indeed, that case appears to support OCC's position. Although indicating that it did not consider CERCLA Section

---

**2.** The court notes that OCC attempts to bolster its argument by suggesting that Section 107(e)(2) refers explicitly to Section 107(a). In its memorandum opposing the County's motion, OCC states that "CERCLA § 107(e)(2) expressly provides that '[n]othing in this subchapter, including the provisions of *[section 107(a)]*, shall bar a cause of action that ... any ... person subject to liability under this section ... has or would have ... against any person.'" Item 902 at 17–18 (emphasis added) (brackets and terms substituted therein supplied by OCC). In fact, Section 107(e)(2) provides that "[n]othing in this subchapter, including the provisions of *[Section 107(e)(1)]*, shall bar a cause of action...." 42

U.S.C. § 9607(e)(2) (emphasis, as well as brackets and terms substituted therein, added). Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).

107(e)(2) to create a right of contribution,[3] the court noted that

[Section 107(e)(2)] expresses Congress' view that CERCLA's liability provisions are not all-inclusive and that the legislature did not intend to preclude individuals from pursuing remedies not expressly provided for by the Act.... [A] reasonable reading and interpretation of the provision shows that section 107(e)(2) simply *preserves* actions not provided by CERCLA, if authority for these actions otherwise exists.

642 F.Supp. at 1265 (emphasis supplied). The County is thus simply reading too much into the case law upon which it relies.

In sum, the court concludes that a party liable for CERCLA response costs is not barred from pursuing contribution for those costs under state law.

## II. *Contribution Under New York Law*

■ The County also argues that, even if OCC is not barred as a matter of law from pursuing its cross-claim, New York common-law principles nonetheless dictate that it is entitled to summary judgment. OCC responds that the record establishes sufficiently negligent conduct by the County to subject it to contribution for any response costs assessed against OCC.

OCC submits the following facts in support of its claim for contribution. *See generally* Item 902 at 3–9. According to OCC, the County, through the NCHD, assumed statutory responsibility for the protection of the health of County residents in 1965.[4]

OCC asserts that in 1968 the NCHD began to direct the removal and relocation of toxic wastes discovered during the construction of Frontier Avenue across the southern end of the Love Canal landfill. These wastes were either moved to another landfill and covered pursuant to the NCHD's instructions or left at the job site and, with the NCHD's agreement, covered with two feet of dirt. OCC states that later, before the State was authorized to remove the covered wastes previously excavated from Love Canal to a new landfill, "the NCHD required soil sampling and information regarding the chemical make-up of the material to insure that soil and conditions at the new landfill were acceptable." Item 902 at 5. The State advised the NCHD of the site conditions and of details of how the wastes would be buried and covered.

OCC states that in April, 1970, the NCHD received a complaint of chemicals "coming up to [the] surface" and of rust-colored water on the land comprising the southern third of the Love Canal landfill, and that less than two weeks later the NCHD discovered exposed drums on the surface at Love Canal. In 1971, the NCHD requested OCC to investigate exposed wastes at Love Canal that were reported to have burned a child who had touched them. In May, 1972, the NCHD received a complaint regarding rust-colored liquid in the sump pump of a house on a lot adjacent to the landfill, and "found rust-colored standing water and exposed metal drums containing rust-colored material at Love Ca-

---

**3.** SARA subsequently did so explicitly. *See* 42 U.S.C. § 9613(f)(1).

**4.** OCC cites New York Public Health Law §§ 1303(1), 1305(2). § 1303(1) (McKinney 1971) provides:

Every local board of health and local health officer shall receive and examine into all complaints made by any inhabitant concerning nuisances, or causes of danger or injury to life and health within the health district, and may enter upon or within any place or premises where nuisances or conditions dangerous to life and health or which are the cause of nuisances existing elsewhere are known or believed to exist ... [to] inspect and examine the same.

§ 1305(2) (McKinney 1971) provides:

If the owner or occupant of any premises whereon any nuisance or condition deemed to be detrimental to the public health exists ... fails to comply with any order or regulation of any local board or health officer having the power of a local board of health for the suppression and removal of any such nuisance or other matter, in the judgment of the board or health officer detrimental to the public health ... such board or its agents or employees may enter upon the premises to which such order or regulation relates, and suppress or remove such nuisance or other matter.

The County has submitted an affidavit stating that the NCHD was not established until 1965. *See* Item 893, Exhibit A, Affidavit of Francis Clifford at ¶ 5.

nal." Item 902 at 6. OCC asserts that "[t]hese events show that the NCHD, after at least 1969, was well aware that site conditions at Love Canal, especially surficial conditions, were not static and that some disposed material was uncovered." Item 902 at 6.

In November 1973, the NCHD discovered odorous liquids and solid materials at Love Canal, and the NCHD official who conducted the investigation informed a Niagara County legislator by letter of what had been found. In the letter, the official relayed the following:

> The Hooker Corp. claims that one of the conditions of acceptance was that the area remain covered. An inspection discloses that covering soil has been removed and the area is only about 40% seeded. It seems obvious that the area should be covered and seeded accordance with current practices now being enforced by solid waste site owners and operators.
>
> The question of who should take the remedial action appears to be a legal matter. The present owner should be asked to cover and seed the undeveloped area or dedicate it to the City of Niagara Falls for park and recreation purposes if the city would agree to cover and seed the area.
>
> Recent legislation has fixed the responsibility of solid waste disposal site permits and operation with the New York State Department of Environmental Conservation. The [NCHD], acting as an "arm" of the State, is preparing a case report against [the current owner] regarding the odorous and hazardous condition; this will be handled by the legal representative in the Buffalo Regional Office [of the Department of Environmental Conservation].

Item 902, Attachment 12. Approximately one week later, the NCHD wrote to the owner of the southern third of the landfill, requesting that he cover any wastes on his property and seed the area in accordance with landfill practices and with ordinances enforceable in Niagara County. He was also told that representatives of the NCHD would continue inspecting the property. *See* Item 902, Attachment 13. The owner, who later spoke with the official who wrote the letter and who also received other letters pertaining to the matter, apparently never complied. *See* Item 902, Attachment 14.

In May and June, 1976, the NCHD discovered strong chemical odors at Love Canal. The NCHD sent several letters to the new owner of the southern third of the landfill directing him to take corrective action, but he apparently never complied. In August, 1976, the NCHD learned of a dark liquid discovered during excavation at the landfill that was described as "aliphatic acid." Item 902, Attachment 22. In October, 1976, the NCHD again sent a letter directing the owner of the southern third of the landfill to remedy the conditions on the property, but it appears that he again did not comply.

In November, 1976, the NCHD notified the City of Niagara Falls that chemical leachate from the landfill was being discharged into the city's storm-sewer system by basement sump pumps in homes adjacent to the landfill. According to the NCHD, "[t]he chemical leachate apparently enter[ed] the sumps through drain tile laid along the outside of home foundation walls." Item 902, Attachment 24. The NCHD advised the city that the discharge of leachate into public waters was illegal, requested that "immediate action" be taken, and cautioned that "the ultimate solution on handling the leachate must ultimately be addressed." *Id.* In November, 1976, the NCHD warned the Niagara Falls Board of Education of "apparent hazards" in vacant areas north and south of the 99th Street School located over the former waste-disposal site, and advised that those areas be avoided. Item 902, Attachment 25.

A year later, the County authorized a contractor to put "clean, sanitary fill" on the southern portion of the landfill "so as to abate a nuisance deemed by [the County's Commissioner of Health] to be dangerous to the public health and welfare of the citizens of the City of Niagara Falls and

the County of Niagara." Item 902, Attachment 26. According to OCC, "[b]esides letter writing, this was the first time that the NCHD used its legal authority to affirmatively address conditions at Love Canal." Item 902 at 9.

In June, 1978, the New York State Commissioner of Health ordered the Niagara County Board of Health to, among other things, "abate the public health nuisance now existing at the Love Canal Chemical Waste Landfill site." Item 902, Attachment 27. As previously noted by the court, the commissioner issued an order declaring the site a public-health emergency in August, 1978, and President Jimmy Carter declared the area a federal emergency through orders issued in August, 1978, and May, 1980. *See United States v. Hooker Chemicals & Plastics Corp.*, 722 F.Supp. at 962, 967.

According to OCC, the record thus establishes that

the County, beginning at least in 1968: 1) exercised regulatory authority over landfills; 2) knew that conditions at Love Canal were such that chemical wastes were being exposed at the landfill; 3) had a statutory duty to insure that such conditions be corrected; and, as early as 1973, 4) expressly assumed responsibility to see that those conditions be corrected; yet 5) failed to do so.

Item 902 at 3. OCC complains that the County, despite being responsible for enforcing the state's public-health law and "plainly aware of exposed waste and water mixed with chemicals on the surface of the Love Canal property," did not take any "direct" corrective action until 1977. Item 902 at 10. OCC maintains that by failing to protect the local community adequately, the County "contributed to and aggravated" the conditions that gave rise to OCC's liability under CERCLA and the New York law of public nuisance—the release or threatened release of hazardous substances at Love Canal. Item 902 at 10–11. OCC argues that it thus is entitled to contribution pursuant to New York Civil Practice

Law § 1401 (McKinney 1976), which provides in relevant part that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them."

OCC does not claim that the County was privy to any information of which OCC was not also aware regarding the nature or magnitude of the public-health threat at the Love Canal landfill. Nor does OCC claim that any action or inaction by the County prevented OCC from doing anything it otherwise would have done to abate the effects of having dumped more than forty-million pounds of hazardous wastes at the site. Rather, OCC argues that, by undertaking to control those effects in a negligent manner, the County contributed to and aggravated the release or threatened release of hazardous substances at the site. Thus, in effect, OCC contends that the County should be held liable as a joint tortfeasor for not doing more to abate the toxic conditions that OCC itself originally had created and, according to the plaintiffs, knowingly let fester.

As brazen as that argument may sound, the court need not, as the County urges, assess the relative culpability of these two parties, because the court finds that, as a matter of New York law, the County cannot be held liable for contribution or indemnification to OCC.

It is well settled under New York law that "a municipality cannot be held liable for negligence in the performance of a governmental function ... unless a special relationship existed between the municipality and the injured party." *De Long v. County of Erie*, 60 N.Y.2d 296, 469 N.Y. S.2d 611, 615, 457 N.E.2d 717, 720 (1983). *See also Kircher v. City of Jamestown*, 74 N.Y.2d 251, 544 N.Y.S.2d 995, 997, 543 N.E.2d 443, 445 (1989).[5] The elements of a "special relationship" are:

(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on

---

5. For a discussion of the waiver of sovereign immunity in New York, *see Florence v.*

*Goldberg*, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 586, 375 N.E.2d 763, 766 (1978).

the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 375, 505 N.E.2d 937, 940–41, (1987) (citations omitted). *See Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055–56 (2d Cir.1990). If a special relationship is found to exist between a municipality and an injured party, then the municipality will shoulder a "special duty" to that party, *Kircher v. City of Jamestown*, 544 N.Y.S.2d at 999, 543 N.E.2d at 447; *Cuffy v. City of New York*, 513 N.Y. S.2d at 373, 375, 505 N.E.2d at 938, 940–41; *De Long v. County of Erie*, 469 N.Y.S.2d at 616, 457 N.E.2d at 721; *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y.S.2d 19, 23, 268 N.E.2d 763, 767 (1971), not owed to the general public, *Kircher v. City of Jamestown*, 544 N.Y.S.2d at 1000, 543 N.E.2d at 448; *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717, 721 (1983); *O'Connor v. City of New York*, 58 N.Y.2d 184, 460 N.Y.S.2d 485, 487, 447 N.E.2d 33, 35 (1983); *Florence v. Goldberg*, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 586, 375 N.E.2d 763, 766 (1978), and its conduct will be measured by a standard of ordinary care. *De Long v. County of Erie*, 469 N.Y.S.2d at 615–16, 457 N.E.2d at 720–21; *Florence v. Goldberg*, 404 N.Y.S.2d at 586, 375 N.E.2d at 766.

The duty owed by a municipality can, depending on the circumstances, be "one normally inuring only to the benefit of the public at large." *Florence v. Goldberg*, 404 N.Y.S.2d at 586, 375 N.E.2d at 766. What transforms it into a "special duty" subjecting the municipality to liability under a standard of ordinary care is the existence of a special relationship between the municipality and the injured party. *Id.*; *O'Connor v. City of New York*, 460 N.Y. S.2d at 487–88, 447 N.E.2d at 35–36.

OCC concedes that the County owed it no special duty. *See* Item 902 at 11. OCC contends, however, that it nonetheless is entitled to seek contribution from the County because of the County's alleged breach "of its duty to the community, or of its duty to the State as its agent"[6] in responding to the conditions at Love Canal pursuant to the mandate furnished to the NCHD by New York's Public Health Law. Item 902 at 11. *See also id.* at 13, 15.

The twist here is that, while the cases refuse to extend municipal liability to breach of a duty owed to the general public, the State is suing in present case not only on behalf of itself, but on behalf of the general public as well.[7]

This anomaly, however, does not salvage OCC's cross-claim. OCC cannot recover simply by claiming that the County breached a duty to "the community" in negligently performing a statutory obligation. As indicated above, the duty allegedly breached must be more than simply a duty owed to the general public. Unless there is a special relationship creating a municipal duty to exercise care "for the benefit of particular individuals," *O'Connor v. City of New York*, 460 N.Y.S.2d at 488, 447 N.E.2d at 36, or "for the benefit of a particular class of individuals," *Sanchez v. Village of Liberty*, 42 N.Y.2d 876, 397 N.Y. S.2d 782, 783, 366 N.E.2d 870, 871 (N.Y. 1977), a municipality cannot be held liable for failure to enforce a statute or regulation. *O'Connor v. City of New York*, 460 N.Y.S.2d at 488, 447 N.E.2d at 36; *Sanchez v. Village of Liberty*, 397 N.Y.S.2d at 783, 366 N.E.2d at 871. *See also Motyka v. City of Amsterdam*, 15 N.Y.2d 134, 256 N.Y.S.2d 595, 598, 204 N.E.2d 635, 637 (1965). The New York Court of Appeals

---

**6.** The State has submitted a memorandum asserting that the NCHD has never been its agent. *See* Item 929.

**7.** The State's "First Amended and Supplemental Complaint" states that "[p]laintiff State of New York ... brings this action on behalf of itself and as *parens patriae*, trustee, guardian and representative on behalf of all residents and citizens of the State of New York, and as trustee of the natural resources, including groundwaters and surface waters, of the State of New York." Item 142 at ¶ 3.

has stated quite clearly that the common-law exception to municipal immunity has been framed so as "to place controllable limits on the scope of [a] municipality's duty of protection and to prevent the exception from swallowing the general rule of governmental immunity." *Kircher v. City of Jamestown*, 544 N.Y.S.2d at 999, 543 N.E.2d at 446–447 (citation omitted). Consequently, even assuming *arguendo* the accuracy of OCC's allegations about the adequacy of the County's efforts, to expose the County to liability in this case would accomplish precisely what the Court of Appeals has declared should not be done—expansion of the scope of municipal liability to breach of a duty owed to the general public.

Nor can OCC maintain its cross-claim on the basis of its allegation that the NCHD breached a duty to the State. OCC does not allege that the State—even if considered as a separate entity apart from the general public for purposes of this motion—justifiably relied [8] upon any actions or representations made by the County.[9] The failure to do so is fatal to OCC's claim that the County owed a special duty to the State within the meaning of New York law: "[T]he injured party's reliance is as critical in establishing the existence of a 'special relationship' as is the municipality's voluntary affirmative undertaking of a duty to act. That element provides the essential causative link between the 'special duty' assumed by the municipality and the alleged injury." *Cuffy v. City of New York*, 513 N.Y.S.2d at 375, 505 N.E.2d at 940. OCC has thus failed to establish that a special relationship existed between the County and the State, thereby precluding the imposition of municipal liability.

The case upon which OCC primarily relies, *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 460 N.Y.S.2d 774, 447 N.E.2d 717 (1983), does not hold otherwise. In that case, the defendants sought to implead the Town of Greece, New York, as a third-party defendant, alleging that the town was liable for contribution or indemnification to the extent that the plaintiffs' damages resulting from a motel fire were caused or exacerbated by the town's negligence.[10] Specifically, the defendants claimed that the town permitted construction that did not comply with applicable fire and safety laws, issued a certificate of occupancy falsely portraying the building as safe and in compliance with fire and safety laws, and failed to uncover the various violations upon inspecting the building. 460 N.Y.S.2d at 776, 447 N.E.2d at 719.

Noting that "proportionate liability rights among joint tortfeasors are analytically distinct from the rights and obligations of the parties to the injured person and that the nexus of duty between wrongdoers may exist independently of the respective duties owing a plaintiff," *id.* 460 N.Y.S.2d at 777, 447 N.E.2d at 720 (footnote omitted), the Court of Appeals found that the defendants were entitled to implead the town for contribution despite the fact that the town was not liable directly to the plaintiffs.

OCC claims that *Garrett* established three distinct bases upon which a municipality can be found liable for the negligent performance of a governmental function. *See* Item 902 at 14; Item 915 at 2–4. Ac-

---

**8.** The New York Court of Appeals has equated "justifiable" reliance with "detrimental" reliance. *See Kircher v. City of Jamestown*, 544 N.Y.S.2d at 998–1000, 543 N.E.2d at 446–447.

**9.** Francis Clifford, the County's Commissioner of Health from 1973 to 1983, has stated that, to his knowledge, the County never made any representations to OCC upon which OCC could have detrimentally relied. *See* Item 893, Exhibit A, Affidavit of Francis Clifford at ¶ 7.

**10.** The town originally was named as a defendant by the plaintiffs on the theory that the town negligently failed to require the motel owners to comply with applicable fire and safety laws and negligently inspected construction of the motel. 460 N.Y.S.2d at 776, 447 N.E.2d at 719. The Appellate Division reversed the trial court's denial of summary judgment for the town and dismissed the complaint. Citing *Sanchez v. Village of Liberty*, 42 N.Y.2d 876, 397 N.Y.S.2d 782, 366 N.E.2d 870 (1977), the court held that "[p]laintiff has alleged no more than a violation by the town of a general duty owed to the public at large, conduct which does not impose upon it any liability to plaintiff." *Garrett v. Town of Greece*, 78 A.D.2d 773, 433 N.Y.S.2d 637 (4th Dep't 1980), *aff'd*, 55 N.Y.2d 774, 447 N.Y.S.2d 246, 431 N.E.2d 971 (1981).

cording to OCC's memorandum, a municipality is liable in tort where it

■ has violated a duty commanded by a statute enacted for the special benefit of particular persons; [2] where the municipality has voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefited thereby; or [3] where it assumes positive direction and control under circumstances in which a known, blatant and dangerous safety violation exists.

Item 902 at 14 (quoting 460 N.Y.S.2d at 778, 447 N.E.2d at 721). OCC maintains that it need only satisfy what it refers to as the "third basis" for municipal liability supposedly established by *Garrett*—namely, that the County "assume[ed] positive direction and control under circumstances in which a known, blatant and dangerous safety violation exist[ed]." *See* Item 915 at 2–4.

OCC is plainly wrong. That portion of the *Garrett* opinion cited in OCC's memorandum was immediately preceded by the following:

When a claim is made that a municipality has negligently exercised a governmental function, liability turns upon the existence of a *special duty* to the injured person, in contrast to a general duty owed to the public.... Such a duty is found when a *special relationship* exists between the municipality and an individual or class of persons, warranting the imposition of a duty to use reasonable care for those persons' benefit.... This principle operates to impose liability where the municipality....

460 N.Y.S.2d at 778, 447 N.E.2d at 721 (emphasis added) (citing *Florence v. Goldberg, supra,* and *Sanchez v. Village of Liberty, supra*). Thus the three "bases" for municipal liability supposedly established thereafter in the opinion were, in fact, merely three examples cited by the Court of Appeals of situations in which

liability can be predicated on the existence of a special relationship between a municipality and an injured person. This conclusion is borne out by the cases cited in the court's opinion—*Motyka v. City of Amsterdam, supra; Florence v. Goldberg, supra; Schuster v. City of New York,* 180 N.Y. S.2d 265 (N.Y.1958); and *Smullen v. City of New York, supra*—but missing from OCC's memorandum.

With regard to the proper standards applicable to a party's attempt to obtain contribution from a municipality, the court stated:

If an independent obligation can be found on the part of a concurrent wrongdoer to prevent foreseeable harm, he should be held responsible for the portion of the damage attributable to his negligence, despite the fact that the duty violated was not one owing directly to the injured person. Thus if the town *owed a duty* to [the defendants] to protect them from foreseeable risks of harm, the breach of which has combined with [the defendants'] own negligence to render them answerable in damages to the injured motel guests, the town should be required to bear responsibility for the injury its negligence has caused [the defendants], in proportion to its own degree of fault.

460 N.Y.S.2d at 778, 447 N.E.2d at 721 (emphasis added). The court then made clear that whether the town owed a "duty" to the defendants was based upon whether a "special relationship" existed between the town and the defendants. *See* 460 N.Y. S.2d at 778–79, 447 N.E.2d at 721–22. The Court of Appeals thus held that, in order for a defendant to obtain contribution from a municipality as a joint tortfeasor in the absence of a special relationship between the municipality and the injured plaintiff, a special relationship must exist between the municipality and the defendant.[11] As noted above, however, OCC concedes that the

---

11. The court added that
  [w]hile such liability would plainly encompass direct injury to [the defendants], it may also properly include the economic damages they may suffer as a result of judgment against them in favor of [plaintiff] motel guests. Thus, the town may be held proportionately liable for such damages if it is found that such exposure to potential tort liability was a foreseeable harm resulting from the town's alleged breach of duty.
  460 N.Y.S.2d at 779, 447 N.E.2d at 722.

County did not owe it a special duty. OCC's cross-claim for contribution must, consequently, be dismissed.[12] In addition, to the extent that OCC's cross-claim seeks indemnification, it must also be dismissed. 460 N.Y.S.2d at 779–80, 447 N.E.2d at 722–23.

Accordingly, the County's motion for summary judgment is hereby granted.

So ordered.

---

12. OCC's reliance on the denial of the County's motion for summary judgment in a related state-court action is likewise misplaced. In *Reading v. Hooker Chemicals & Plastics Corp.,* No. 55580, slip op. (Niagara County, March 5, 1985), *aff'd* 119 A.D.2d 980, 500 N.Y.S.2d 1014 (N.Y.App.Div., 4th Dep't 1986), Justice Kuszynski of the New York Supreme Court concluded that an issue of fact existed with regard to whether a special relationship existed between the County and the plaintiffs. The plaintiffs in that case, however, were individual residents of the Love Canal area asserting that they had detrimentally relied upon the County's allegedly negligent conduct.